NON-CONFIDENTIAL VERSION

No. 2026-1229

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,

Plaintiff – Appellant

ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,

Plaintiff

v.

UNITED STATES, REBAR TRADE ACTION COALITION,

Defendants – Appellees.

Appeal from the United States Court of International Trade in
Case No. 23-00131, Judge Gary S. Katzmann

# RESPONSE BRIEF OF DEFENDANT-APPELLEE REBAR TRADE ACTION COALITION

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Stephen A. Morrison, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action
Coalition*

Dated: May 4, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2026-1229

**Short Case Caption** Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. US

**Filing Party/Entity** Rebar Trade Action Coalition - Defendant Appellee

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/22/2025

Signature: /s/ Alan H. Price

Name: Alan H. Price

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Rebar Trade Action Coalition | | Byer Steel Group, Inc. |
| | | Commercial Metals Company |
| | | Gerdau Ameristeel U.S. Inc. |
| | | Nucor Corporation |
| | | Steel Dynamics, Inc. |
| | | Optimus Steel LLC |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable            ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ......................................................................................... 1

II.   STATEMENT OF RELATED CASES ......................................................... 1

III.  JURISDICTIONAL STATEMENT ............................................................. 1

IV.  STATEMENT OF THE ISSUES ................................................................. 2

V.   STATEMENT OF THE CASE ..................................................................... 3

     A.     Statutory and Regulatory Background .................................................. 4

     B.     2020 Administrative Review Proceedings ............................................. 5

     C.     Proceedings Before the CIT ................................................................... 7

     D.    Commerce's Remand Determination ..................................................... 7

     E.     The CIT Sustains Commerce's Remand Determination ..................... 11

VI.  SUMMARY OF ARGUMENT .................................................................. 12

VII.  ARGUMENT ............................................................................................. 14

     A.     Standard of Review ............................................................................. 14

     B.     Commerce's Selection of the Land for LTAR Benchmark
           Was Reasonable and Supported by Substantial Evidence ................. 16

VIII. CONCLUSION ......................................................................................... 26

## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted from page 25 relates to terms of the C&W Report.

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Archer Daniels Midland Co. v. United States,*
968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ..................................................4, 5, 6

*Boomerang Tube LLC v. United States,*
856 F.3d 908 (Fed. Cir. 2017) ..................................................................20, 24

*Ceramica Regiomontana, S.A. v. United States,*
810 F.2d 1137 (Fed. Cir. 1987) ..........................................................................16

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966) .............................................................................................15

*CP Kelco US, Inc. v. United States,*
24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) ........................................................15

*Dongtai Peak Honey Indus. Co. v. United States,*
777 F.3d 1343 (Fed. Cir. 2015) ..........................................................................15

*Guizhou Tyre Co. v. United States,*
523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) .........................................................4

*INS v. Elias-Zacarias,*
502 U.S. 478 (1992) .............................................................................................15

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States,*
736 F. Supp. 3d 1318 (Ct. Int'l Trade 2024) .........................................................7

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States,*
803 F. Supp. 3d 1276 (Ct. Int'l Trade 2025) ...............................................*passim*

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States,*
No. 24-1431 (Fed. Circ. Nov. 17, 2025) ................................................................1

*Matsushita Elec. Indus. Co. v. United States,*
750 F.2d 927 (Fed. Cir. 1984) ............................................................................15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ..........................................................................................16, 17

*QVD Food Co. v. United States,*
  658 F.3d 1318 (Fed. Cir. 2011) ..................................................................19

*Saha Thai Steel Pipe Pub. Co. v. United States,*
  101 F.4th 1310 (Fed. Cir. 2024) .................................................................14

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951)................................................................................14, 15

*Zenith Radio Corp. v. United States,*
  437 U.S. 443 (1978)......................................................................................15

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(iii)........................................................................14

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................14

19 U.S.C. § 1677(5)(A)-(B)..................................................................................4

28 U.S.C. § 1292...................................................................................................2

28 U.S.C. § 1295(a)(5)..........................................................................................2

28 U.S.C. § 1581(c) .........................................................................................2, 14

Pursuant to the Tariff Act of 1930 ......................................................................4

**Regulations**

19 C.F.R. § 351.511(a)..........................................................................................4

19 C.F.R. § 351.511(a)(2)(i) ...............................................................................20

**Administrative Materials**

*Coated Free Sheet Paper from Indonesia,*
  72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007)................................23

## I.  **INTRODUCTION**

On behalf of Defendant-Appellee the Rebar Trade Action Coalition ("RTAC"), we respectfully submit this response to the February 9, 2026 opening brief filed by Plaintiff-Appellant Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"). Opening Br. for Pl.-Appellant Kaptan Demir Celik Endustrisi ve Ticaret, A.S. (Feb. 9, 2025), ECF No. 10 ("Kaptan's Br.").

## II.  **STATEMENT OF RELATED CASES**

RTAC disagrees with Kaptan that the Court's decision in this case is affected by Kaptan's appeal of the 2018 administrative review of Steel Concrete Reinforcing Bar from the Republic of Turkey, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, No. 24-1431 (Fed. Circ. Nov. 17, 2025) ("*Kaptan 2018*"). The matter at issue in *Kaptan 2018* related to whether countervailable subsidies received by Kaptan's affiliate, Nur Gemicilik ve Tic. A.S. ("Nur") could be cross-attributed to Kaptan. While Kaptan also appealed aspects of the benchmarking determination in that case, the issue was mooted when the U.S. Department of Commerce ("Commerce") found on remand that Nur was not a cross-owned input supplier and that subsidies it received could not be cross-attributed to Kaptan.

## III.  **JURISDICTIONAL STATEMENT**

This is an appeal from the final judgement of the U.S. Court of International Trade ("CIT") in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,

No. 23-00131, Appx0026-Appx0048. The CIT entered its final judgement on October 6, 2025. The CIT exercised jurisdiction pursuant to 28 U.S.C. § 1581(c). Kaptan filed its appeal on December 3, 2025, making it timely under Fed. Cir. R. 4. Kaptan identified 28 U.S.C. § 1292 as the source of the Court's jurisdiction over this appeal. Kaptan's Br. at 2. That statutory provision relates to appeals from interlocutory orders of the lower courts, rather than appeals from final judgements. This case arises from Kaptan's appeal of a final judgement of the CIT, disposing of all parties' claims. This Court therefore has jurisdiction under 28 U.S.C. § 1295(a)(5).

## IV. <u>STATEMENT OF THE ISSUES</u>

This appeal raises the following issue:

1. Whether Commerce's determination to select a report issued by Colliers International titled "Turkey: Real Estate Market Review" ("Colliers Report") as the source of benchmark data for assessing the benefits that Kaptan received from the Government of Turkey ("GOT") by means of provision of land for less than adequate remuneration ("LTAR") is supported by substantial evidence and is otherwise in accordance with law.

## V. **STATEMENT OF THE CASE**

This appeal arises from Commerce's final results in the 2020 annual administrative review of a countervailing duty order covering certain steel concrete reinforcing bar from the Republic of Turkey ("Turkey"). *See, e.g.*, Appx0069-Appx0089. Commerce initiated the review on December 28, 2021, and selected Kaptan as a mandatory respondent. *See, e.g.*, Appx0049-Appx0050 & n.8. In the final results, Commerce determined that the GOT provided rent-free land to Kaptan's affiliate, Nur. *See* Appx0073. To measure the benefit Kaptan received by means of the rent-free use of this land, Commerce sought to determine the market rental value for the land. Commerce selected certain rental values for industrial properties contained in the Colliers Report as its benchmark for determining the benefit. *See* Appx0074-Appx0078; *see also* Appx0177-Appx0206.

Kaptan appealed Commerce's benchmark selection and other aspects of Commerce's final results to the CIT. Appx0003. The CIT initially remanded Commerce's benchmark selection for further explanation, finding that Commerce had not fully addressed all of the arguments Kaptan had raised regarding the appropriateness of the Colliers Report as the source of benchmark rental values. *See* Appx0017-Appx0024. On remand, Commerce again selected the Colliers Report as the benchmark source, addressing Kaptan's arguments and providing further explanation; the CIT then upheld Commerce's remand determination. Appx0026-

Appx0048. The lower court's decision was published as *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 803 F. Supp. 3d 1276 (Ct. Int'l Trade 2025). Kaptan subsequently lodged this appeal to renew in part the challenges that it raised at the CIT regarding Commerce's benchmark data selection, while dropping other arguments that it does not raise here.

## A.    Statutory and Regulatory Background

Pursuant to the Tariff Act of 1930, a subsidy exists where a government authority provides a financial contribution that confers a benefit. 19 U.S.C. § 1677(5)(A)-(B). A "financial contribution" may take the form of the government's provision of goods or services, including the provision of land. *See id.* § 1677(5)(D)(iii). Such a financial contribution provides a benefit to the extent that the government's price for the item or service is inconsistent with prevailing market conditions. *Id.* § 1677(5)(E)(iv). To measure the benefit of the government's provision of the good or service, Commerce compares the government price to a market-determined benchmark price. *See* 19 C.F.R. § 351.511(a). "{W}here there are multiple prices that can be used as a viable benchmark on the record, Commerce will compare the prices to select the most comparable." *See Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1383 (Ct. Int'l Trade 2021). "Commerce . . . is required only to select benchmarks that are comparable, not identical." *See Archer*

*Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1278 (Ct. Int'l Trade 2014).

**B.    2020 Administrative Review Proceedings**

Kaptan reported that during the 2020 review period, its affiliate, Nur, used GOT-owned land for free. Appx0061-Appx0062. Both RTAC and Kaptan submitted information for Commerce's potential use in identifying a market-determined rental value for Nur's land. Appx0177-Appx0206; Appx0207-Appx0241. RTAC submitted the Colliers Report, a publicly-available document that provided, among other information, rental rates for the second and fourth quarters of 2020 for industrial properties located in Istanbul and several surrounding regions. Appx0177-Appx0204. Kaptan submitted a proprietary study regarding Turkish real estate values, which it commissioned from Cushman & Wakefield ("C&W Report").[1] Appx0207-Appx0241; Appx0077. The C&W Report provided 2022 rental rates for thirteen commercial, industrial, private use, tourism, land, and field-type properties located in Trabzon, the province in which Nur's land was located. *See* Appx0207-Appx0208; Appx0842-Appx0871. The C&W Report also provided 2022 rental rates for three government-leased properties, including two properties in or near Istanbul. *See id.*

---

[1]    Kaptan initially submitted the C&W Report as a proprietary document. *See* Appx0207-Appx0241. On remand, Commerce requested that Kaptan submit the report as a public document, and Kaptan did so. *See* Appx0842-Appx0871.

Commerce decided to use certain data contained in the Colliers Report to benchmark the value of Nur's land. Appx0076-Appx0078. Specifically, Commerce used 2020 industrial rental rates in Cerkezkoy, Tekirdag ("Cerkezkoy"), which was the area covered by the Colliers Report with the most similar population density to Trabzon, the province in which Nur's land is located. *See* Appx0077; Appx0061-Appx0062. Commerce explained its selection of the Colliers Report by noting its preference for public benchmark data and benchmarks not generated for purposes of administrative proceedings. *See* Appx0077-Appx0078. Commerce found unpersuasive Kaptan's claims that the Colliers Report was unusable due to its liability disclaimer and for "cit{ing} to itself as the data source." Appx0077. Commerce found that the Colliers Report data was not distortive and that the properties valued therein were comparable to the land used by Nur. *Id.* Commerce explained that it used only rental data from Cerkezkoy, rather than all areas in the Istanbul region, because Cerkezkoy had the most similar population density to the area where Nur was located. *See* Appx0077; Appx0061-Appx0062. Commerce also described the C&W Report as not usable due to the fact that it was not public, not contemporaneous with the period of review ("POR"), and was "generated expressly for the purpose of an administrative proceeding." Appx0077-Appx0078.

**C. Proceedings Before the CIT**

Kaptan appealed Commerce's benchmarking data selection to the CIT. *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318 (Ct. Int'l Trade 2024) ("*Kaptan I*"), Appx0001-Appx0024. The CIT found that Commerce had not adequately addressed all arguments Kaptan raised to it regarding the appropriateness of the Colliers Report as the benchmark source. *Kaptan I*, 736 F. Supp. 3d at 1330-33, Appx0019-Appx0024. Specifically, the CIT found that Commerce failed to adequately address Kaptan's claim that the data in the Colliers Report was distortive and was not representative of Nur's land. *See id.* The CIT therefore remanded for Commerce to address these claims.

**D. Commerce's Remand Determination**

In its draft remand determination, Commerce reaffirmed its use of the Colliers Report as the benchmark data source. Appx0101-Appx0108. In doing so, Commerce compared the merits and shortcomings of the Colliers Report and the C&W Report. Commerce explained that its preference was to use benchmark data that were (1) contemporaneous in time with when a benefit had been conferred, (2) prepared and issued by independent, third-party sources, and (3) not commissioned for the purposes of use in administrative proceedings or litigation. Appx0102-Appx0107. Commerce explained that the Colliers Report was the superior benchmark with respect to these factors as (1) the data in the C&W Report were less

contemporaneous than those in the Colliers Report and (2) the C&W Report had been commissioned by Kaptan for use in the administrative proceeding, while the Colliers Report had not. Appx0105-Appx0107.

Commerce also addressed Kaptan's claims regarding the comparability of the properties covered by the Colliers Report with the land Nur leased from the GOT. Commerce found that the record did not indicate that the Colliers Report data were aberrational or otherwise unsuitable for use as a benchmark. Appx0103-Appx0104. Commerce then addressed Kaptan's arguments that the regions of Turkey covered by the Colliers Report were too dissimilar from Trabzon, where Nur's land was located, to provide a reasonable benchmark source. The agency noted that, contrary to Kaptan's claims that regional/municipal differences in per-capita gross domestic product ("GDP") rendered the Colliers Report's data unsuitable, nothing on the record demonstrated that "rent amounts in Turkey {are} strictly in line with the per capita GDP of cities." Appx0106. Similarly, the agency found no record evidence to demonstrate that differences in the level of development of the land, levels of competition and market size, and relative physical distance from Istanbul made the properties in the Colliers Report unrepresentative of Nur's property. *Id.* Nonetheless, Commerce also noted that, in using the Colliers Report, it calculated its benchmark using only property values for the area—Cerkezkoy—that had the most similar

population density and GDP to that of the area in which Nur's land was located. Appx0108.

Kaptan filed comments regarding Commerce's draft remand redetermination, opposing Commerce's continued use of the Colliers Report for various reasons, two of which are at issue in this appeal.[2] *See* Appx0762-Appx0793. First, Kaptan argued that Commerce had not sufficiently explained its determination not to use the C&W Report. Appx0775-Appx0780. Specifically, Kaptan argued that Commerce had ignored evidence of the reliability of the C&W Report—namely, the fact that it was prepared by a reputable real estate firm, was prepared in accordance with the RICS valuation standard, and provided a detailed description of Nur's land. Appx0776-Appx0778. Second, Kaptan argued that the C&W Report was a more comparable benchmark than the Colliers Report. Appx0785-Appx0792. Relevant here, Kaptan claimed that the C&W Report was more comparable to Nur's land than the Colliers Report because the properties valued were in the same province as Nur, it valued similar types of properties, and it provided a description of the methodologies used to value the land. Appx0788-Appx0792. Kaptan also argued that the Colliers Report was not an appropriate benchmark for Nur's land because of demographic,

---

[2] Kaptan raised one other argument in response to the draft results, which it does not appeal here, including a claim that the Colliers Report could not be used as a benchmark because it allegedly reflected rental values for properties within government-operated industrial zones. *See* Appx0781-Appx0785.

economic, and geographic differences between the Istanbul region and Trabzon province. *See* Appx0788-Appx0789.

In its final remand determination, Commerce responded to Kaptan's contentions. Commerce explained that it had not discounted or ignored factors that Kaptan cited in favor of the C&W Report's reliability, but instead found that these were not enough to outweigh concerns regarding the objectivity of the report, given record evidence indicating that it was prepared specifically to be used as a source of benchmark data in the administrative proceeding and was at least partially based on information provided by Kaptan. *See* Appx0139-Appx0141. Commerce also explained that it disagreed with Kaptan that the properties valued in the C&W Report were more comparable to Nur's land than the properties valued in the Colliers Report. Appx0143-Appx0145. Commerce highlighted its preference for benchmarks that were more contemporaneous with the time in which the land use rights were received, and noted that the record lacked any evidence demonstrating that differences in GDP, value of foreign trade, and distance from Istanbul were correlated with specific or predictable differences in property rental values. Appx0144-Appx0145. Commerce also found that the methodologies used in preparing the C&W Report and Colliers Report did not give one benchmark an advantage over the other. Appx0145. Finally, Commerce reiterated its preference for the Colliers Report since it was independently produced and there was thus no

concern that it was biased or tailored to generate certain results in the administrative proceeding. *Id.*

### E. The CIT Sustains Commerce's Remand Determination

Before the CIT, Kaptan again challenged Commerce's use of the Colliers Report instead of the C&W Report. *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 803 F. Supp. 3d 1276 (Ct. Int'l Trade 2025) ("*Kaptan II*"), Appx0026-Appx0048. The CIT rejected Kaptan's contentions, finding that Commerce provided "reasoned disagreement to Kaptan's concerns about the adequacy of the {Colliers Report}" and that Commerce had addressed the key concern animating the earlier remand—whether the agency considered Kaptan's argument that Colliers Report was not reasonably reflective of rental values for the land used by Nur. *Id.* at 1289, Appx0044. Specifically, the court noted that Commerce had explained that the record lacked evidence to support Kaptan's claim that factors such as GDP, industrial development, distance between the land used by Nur and the land valued in the Colliers Report, and the value of foreign trade detracted from the validity of the Colliers Report. *Id.*, Appx0044-Appx0045.

The CIT also found that Commerce had properly weighed the merits of the Colliers Report and C&W Report in selecting which data source to use in calculating a benchmark rental value. *Id.* at 1290, Appx0045-Appx0047. The CIT found that Commerce reasonably determined not to use the C&W Report because (1) it bore a

11

higher risk of litigation-inspired fabrication due to its being commissioned by Kaptan for use in the proceeding and (2) its data were less contemporaneous with the period in which Nur acquired its lease than the data in the Colliers Report. *Id.* at 1290, Appx0047. The CIT thus found that Commerce's selection of the land benchmark was supported by substantial evidence. *Id.* at 1290-91, Appx0047.

This appeal followed.

## VI.  **SUMMARY OF ARGUMENT**

Commerce's selection of the Colliers Report to benchmark the benefits of Nur's rent-free land was appropriate, and Kaptan's claims to the contrary are unavailing. On remand below, Commerce did as it was directed by the court. It compared the relative merits of the Colliers Report and the C&W Report and addressed Kaptan's concerns regarding the comparability of the land valued in the Colliers Report to Nur's land in Trabzon province. In weighing the relative merits of these two proposed benchmark data sources, Commerce found that the Colliers Report was "strictly preferable" to the C&W Report because it was more contemporaneous in time with Nur's receipt of rent-free land from the GOT and because it was produced by an independent source, whereas the C&W Report had been commissioned by Kaptan for use in the review. *See* Appx0128, Appx0139-Appx0145.

Nonetheless, Kaptan now challenges the remand results on two grounds. First, Kaptan claims that use of the Colliers Report is *per se* unreasonable because the property values therein are from the Istanbul region, which is remote from Nur's land and has a higher per capita GDP than Trabzon. *See* Kaptan's Br. at 16-18. However, as Commerce and the CIT both noted, the administrative record lacks any evidence that proximity to Istanbul or per capita GDP correlates with industrial rental prices. Appx0126; *Kaptan II*, 803 F. Supp. 3d at 1289, Appx0045. As such, it was reasonable for Commerce to determine that the industrial rental rates in the Colliers Report were representative of the market rental value of Nur's land.

Second, Kaptan asks the Court to second-guess Commerce's reasonable determination that the C&W Report was less preferable because Kaptan commissioned it for use in Commerce proceedings and because its data were less contemporaneous with the time period in which Nur acquired its lease. While Kaptan claims that the record does not show that the C&W Report was prepared for use as a benchmark in this proceeding, *see* Kaptan's Br. at 25-27, Kaptan requested that the rental values in the report—which was commissioned in 2022—reflect rental values for 2020, the year that this administrative review covers, indicating that it was intended as a valuation benchmark before Commerce. *See* Appx0849. Similarly, Kaptan's claim that the Colliers Report is no more contemporaneous than the C&W Report is unconvincing. Kaptan provides no evidence that the data contained in the

Colliers Report is not from 2020. To the contrary, the Colliers Report states that the values therein were taken from two distinct periods—the second and fourth quarters of 2020. As such, the data in the Colliers Report is not only contemporaneous with the review period, it is demonstrably more contemporaneous with the time at which Kaptan received its land rights from the GOT than the 2022 data in the C&W Report.

## VII. ARGUMENT

### A. Standard of Review

This Court "review{s} the {CIT's} decisions *de novo*, applying the same standard of review used by the {CIT}" in reviewing Commerce's determinations. *Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1322 (Fed. Cir. 2024). Kaptan invoked the CIT's jurisdiction pursuant to 19 U.S.C. § 1581(c) and asserted a claim pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii). Appx0009. Accordingly, the Court must affirm Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial

evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1349 (Fed. Cir. 2015). The courts have framed the substantial evidence standard as a review for "reasonableness," in which "{the} court's function is merely to ascertain 'whether there was evidence which could reasonably lead to the {agency's} conclusion.'" *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1344-45 (Ct. Int'l Trade 2014) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). Moreover, the Court may not substitute its judgment for that of the agency when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp.*, 340 U.S. at 488; *see also Zenith Radio Corp. v. United States*, 437 U.S. 443, 459 (1978) ("{I}t is not the task of the judiciary to substitute its views as to fairness and economic effect for those of the Secretary.").

The Court does not re-weigh the evidence on the record and decide the case for Commerce anew. *See Matsushita Elec.*, 750 F.2d at 933. Rather, factual findings by Commerce are afforded considerable deference. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). And the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be

discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

## B. Commerce's Selection of the Land for LTAR Benchmark Was Reasonable and Supported by Substantial Evidence

Commerce selected the benchmark source in this proceeding based on a detailed comparison of the two sets of benchmarking data placed before it. Specifically, the agency compared the C&W Report and the Colliers Report on a number of factors, including (1) contemporaneity with the period in which Nur entered into its lease with the GOT; (2) reliability based on the expertise of the firm preparing the report, the firm's evaluation standards, and whether the report was produced independently or for use in the administrative proceeding, and (3) comparability of the valued land to the land used by Nur. Appx0128. Only after evaluating both the C&W Report and the Colliers Report across each of these factors did Commerce determine that the Colliers Report constituted the best available benchmark data. *See* Appx0122-Appx0129, Appx0139-Appx0145.

In selecting in favor of the Colliers Report, the agency recognized that the Colliers Report valued industrial rental properties in the Istanbul region, and not the province of Trabzon, where Nur's land is located. But it explained that the record

16

contained no evidence that industrial rates in the Istanbul region were not reasonably comparable to those in Trabzon. *See* Appx0144-Appx0145. Given the lack of affirmative evidence indicating that industrial rental rates in the Istanbul region were not comparable, Commerce correctly determined that differences in GDP between the Istanbul region and Trabzon and the distance between the two regions did not disqualify the Colliers Report. *Id.*

On the other hand, Commerce found that the C&W Report was not suitable as a benchmark given that (1) the report's data were less contemporaneous with the time at which Nur received the land from the GOT than the data in the Colliers Report, and (2) the C&W Report appeared to have been prepared at Kaptan's behest for purposes of use in the countervailing duty review, *see* Appx0122-Appx0124, Appx0139-Appx0142, whereas the Colliers Report data consisted of "contemporaneous original research from an independent, third-party source." Appx0123.

Now, Kaptan claims that Commerce's selection of the Colliers Report as the land for LTAR benchmark was neither reasonable nor supported by substantial evidence. First, Kaptan argues that use of the Colliers Report was unreasonable because (1) it provided rental rates for properties in a different region of Turkey than Nur's land, (2) is not a land valuation report, (3) did not appropriately disclose its sources or methodologies, and (4) contains a liability disclaimer. *See* Kaptan's Br.

at 15-23. Second, Kaptan argues that Commerce's reasons for not using the C&W Report—that the report was not based on data contemporaneous with the period of review and that it appeared to have been prepared specifically for purposes of the administrative proceeding—were unsupported by substantial evidence. *Id.* at 23-27.

Kaptan's claims are nothing more than invitations for this Court to reweigh the evidence. As detailed below, Commerce's selection of the Colliers Report as its source of benchmarking data was both reasonable and supported by substantial record evidence.

### 1. Commerce's Selection of the Colliers Report Was not *Per Se* Unreasonable

Kaptan argues that the Colliers Report was *per se* unreasonable as a source of benchmark data. First, Kaptan claims that reliance on the Colliers Report is unreasonable because the Istanbul region is too distinct from Trabzon, the area in which Nur's land was located. Kaptan's Br. at 16-18. Next, it claims that Commerce's reliance on the Colliers Report is unreasonable because the report is not "a valuation," does not disclose the underlying data or the methodology for calculating rental values, and contains a disclaimer. *See id.* at 18-23.

First, Kaptan claims that distinctions in regional GDP, as well as the fact that there is a 750-km distance between Istanbul and Trabzon, serve to render the Colliers Report-based benchmark "distorted." *Id.* at 17-18. But as Commerce explained, despite Kaptan's speculation that industrial rental prices in Turkey correlate

18

predictably with GDP (*i.e.*, areas with higher GDP have higher industrial rental prices), "there {was} no record evidence for this claim." Appx0126. Rather, while the record contained information indicating the GDPs of various Turkish provinces, it lacked evidence of any "quantifiable link between a province's GDP and its industrial rent." *Id.* Similarly, the agency concluded that there was "no record information to quantify the proportional effect" of distance from Istanbul on industrial rental rates. Appx0126-Appx0127.

Instead of facing the natural results of its failure to build a record on this point, Kaptan attempts to turn the burden of proof on its head, faulting Commerce for not citing evidence to show that factors such as GDP, distance from Istanbul, *etc.*, lacked a relationship to regional industrial rental rates. Kaptan's Br. at 18. But as the CIT aptly noted, because it was Kaptan that argued that such a relationship existed, it was Kaptan's burden to demonstrate that point. *Kaptan II*, 803 F. Supp. 3d at 1289, Appx0045; *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("The burden of creating an adequate record lies with interested parties and not with Commerce."). Having failed to provide evidence of the nature of such a relationship, or even its existence, Kaptan's attempts to overturn Commerce's benchmark selection amount to "spaghetti thrown at the wall." *Kaptan II*, 803 F. Supp. 3d at 1289, Appx0045. And to the extent that Kaptan attempts to characterize its propositions as self-evident, Kaptan's Br. at 28, it succeeds only in underscoring

the fundamental problem with its argument. Specifically, the argument proceeds from mere unsupported assumptions about the impact of distance, GDP, *etc.*, on industrial rental rates in various regions of Turkey, rather than from any record evidence regarding how those factors impact such rates.

Kaptan fares no better with it claims that Commerce's reliance on the Colliers Report is unreasonable because the report is not "a valuation," does not disclose the underlying data or the methodology for calculating rental values, and contains a disclaimer. *See id.* at 18-23. As an initial matter, Kaptan failed to make these objections in the remand proceedings below, *see generally* Appx0762-Appx0793, and has thus waived them on appeal. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017). Nor is there any substantive merit to these arguments.

First, there is no requirement that Commerce must rely on a "valuation" (however that might be defined) as the source of its benchmark data. Commerce's regulations state that the agency will normally measure the adequacy of remuneration based on market determined prices "resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). In assuming that only a "valuation" (again, whatever that might be) can serve as a source of benchmarking data, Kaptan reads a requirement into Commerce's regulations that does not exist. For that matter, Commerce explained that the Colliers Report conforms with its

regulatory requirements because the report provides data regarding actual industrial rental values from the private market in 2020. *See* Appx0127.

Nor does Kaptan persuade that the Colliers Report is unusable because of a failure to disclose its methodologies or underlying data. The Colliers Report was issued as part of a regularly published series of reports that, as Commerce noted, Colliers International prepared based on its own research into the Turkish rental prices in and around the Istanbul region. Appx0077; Appx0123; Appx0837; Appx0184-Appx0204. And while Kaptan claims that courts often reject expert valuation reports when the expert does not sufficiently disclose the underlying data, Kaptan's Br. at 20-21, the cases it cites relate to the admissibility of expert testimony in judicial proceedings, not selection of benchmarking data sources by Commerce.[3]

Kaptan also makes much of the fact that the Colliers Report states that it "must not be treated as investment or valuation advice or an offer to buy or sell property." *Id.* at 19. Such disclaimers are common and are simply used to protect companies

---

[3] For that matter, the C&W Report is hardly transparent regarding its data sources and methodologies. For example, in providing 2022 rental prices for thirteen privately-owned properties that were deemed "comparable" to Nur's land, the C&W Report states only that the parcels and their rental values were identified through undisclosed websites and real estate advisories. Appx0848, Appx0869. The C&W Report says nothing about the basis on which the parcels were deemed "comparable" to Nur's government-leased property, or how comprehensive (or limited) the reported data are in relation to the original data sources. Appx0869. For that matter, the C&W Report study admits that the "comparable" properties are dissimilar to Nur's property in terms of "zoning conditions," with all but one parcel identified as non-industrial. *Id.*

providing compiled data from being sued if a party uses that data in making investment decisions or values its property using that data. As Commerce noted, the fact that a benchmark data source contains a disclaimer of liability is not what is at issue in determining what benchmark to select—instead it is overall suitability of that benchmark data source for valuing the property at issue. *See* Appx0122 (citing Appx0077). As Commerce noted, Colliers International is a reliable, independent, third-party source whose reports have been used in prior proceedings as benchmarks. Appx0123. Kaptan has provided no evidence demonstrating that Colliers International, or the Colliers Report, is not accurate or reliable, simply because of a boilerplate disclaimer of liability.

### 2. Commerce's Determination Not to Use the C&W Report is Supported by Substantial Evidence

The C&W Report is dated June 7, 2022, and provides 2022 advertised rental values for thirteen properties (only one of which was industrial), with the values then deflated to reflect estimated 2020 values at Kaptan's specific request. Appx0846; Appx0869-Appx0870; *see also* Appx0849; Appx0107. The report was "prepared for Kaptan" and was based at least in part on data that Kaptan itself provided to Cushman & Wakefield. Appx0846; Appx0848. By contrast, the C&W Report was published in early 2021 and covers rental prices in Turkey in the second and fourth quarters of 2020. *See* Appx0204 (noting a 2021 copyright); Appx0192-Appx0194.

On remand, Commerce explained that it selected against the C&W Report as its source of benchmarking data because (1) its data were less contemporaneous than those of the Colliers Report and (2) it appeared to have been prepared for use in administrative proceedings before the agency, and thus bore a "risk of litigation-inspired fabrication or exaggeration." Appx0127; *see also* Appx0126 (quoting Issues and Decision Memorandum accompanying *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007) (final affirm. countervailing duty deter.) at cmt. 12). Kaptan argues that neither determination finds support in the record, but these objections are without merit.

Kaptan first argues that Commerce's determination that the C&W Report's data were less contemporaneous than those of the Colliers Report is not supported by substantial evidence. Kaptan's Br. at 23-25. However, it focuses less on when the transactions covered by the Colliers Report took place than on the fact that the Colliers Report provides average industrial rental values for various areas within the Istanbul region in the second and fourth quarters of 2020, rather than individual transaction values. *Id.* at 23 ("The Colliers Review discusses trends in Greater Istanbul real estate for the second half of 2020 but does not disclose the underlying data on which such trends are based."; "{B}ecause the Colliers Review does not disclose any source data or methodology, it is literally impossible to evaluate whether whatever source data was used accurately reflects prices in 2020, even for

23

Greater Istanbul."). In other words, Kaptan recasts its concerns over the transparency of the Colliers Reports' methodology as a contemporaneity concern. But as discussed above, these arguments have no merit; further, Kaptan failed to raise them in its comments to the agency on remand and has thus waived them on appeal before this Court. *See Boomerang Tube*, 856 F.3d at 912-13.

To the extent that Kaptan attempts to cast doubt on the contemporaneity of the Colliers Report based on its 2021 publication date, Kaptan's Br. at 24, the argument holds no water. The Colliers Report explicitly states that the data on which the listed rental values are based were taken at two distinct times—the second and fourth quarters of 2020. *See* Appx0194. The Colliers Report even provides two separate rental values for each of these times, further demonstrating that the listed values include data from those specific time periods, and not other periods of time, such as 2021. *Id.* And further demonstrating the hollowness of Kaptan's claim, even if the Colliers Report did contain 2021 data (which it does not), 2021 is still more contemporaneous to both the review period and Nur's initial receipt of the rent-free land than 2022, the year in which the C&W Report was prepared, and to which its data correspond.

Kaptan also claims that no record evidence suggests that the C&W Report was prepared for purposes of this proceeding. Kaptan's Br. at 25-27. This claim is belied by the record. Kaptan commissioned the C&W Report in 2022, but specifically

requested that the C&W Report reflect rental prices in the year 2020—the period of review of the proceeding underlying this appeal. *See* Appx0849 ("Upon request of client, 2020 annual average is considered."); Appx0299 ("[

<span style="color:red">Terms of C&W Report</span>

]"). There would be no commercial reason for Kaptan to commission a land valuation report to determine the market rental value of Nur's land for a period of time in the past. Accordingly, Commerce reasonably concluded that the C&W Report was commissioned for use in connection with this countervailing duty proceeding.

Finally, contrary to Kaptan's claims, Commerce did not need to identify any specific flaws in the data or methodology used to compile the C&W Report in order to reasonably select against its use due to a heightened risk of litigation-inspired fabrication or exaggeration. Even a study conducted using otherwise unobjectionable methodologies will provide unreliable results if the underlying data itself is incorrect or has been tainted. As the saying goes, garbage in, garbage out. In this regard, Commerce noted that the C&W Report was commissioned by Kaptan, paid for by Kaptan, and based on data provided by Kaptan. *See* Appx0140. The timing of the report's commissioning, and Kaptan's request that C&W deflate its data to reflect estimated 2020 values also suggested that Kaptan commissioned the report specifically to be used as a benchmark in this proceeding. *See* Appx0140-Appx0141. As such, Commerce reasonably determined that the C&W Report bore

25

a risk of litigation-inspired fabrication or exaggeration that was not present with respect to the Colliers Report, and thus was less preferable for use as the source of benchmark rental values in this administrative review.

## VIII. <u>CONCLUSION</u>

For the foregoing reasons, RTAC respectfully requests that the Court affirm the decision of the CIT.

Respectfully submitted,

*/s/ John R. Shane*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Stephen A. Morrison, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: May 4, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2026-1229

**Short Case Caption:** Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✔] the filing has been prepared using a proportionally-spaced typeface and includes __5864__ words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __05/04/2026__

Signature: /s/John R. Shane

Name: John R. Shane