# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,

Plaintiffs-Appellant,

ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,

Plaintiff,

v.

UNITED STATES, REBAR TRADE ACTION COALITION

Defendant-Appellees.

On Appeal from the United States Court of International Trade in case nos. 1:23-cv-00131-GSK, Judge Gary S. Katzmann.

## BRIEF OF DEFENDANT-APPELLEE UNITED STATES

BRETT A. SHUMATE
*Assistant Attorney General*

PATRICIA M. McCARTHY
*Director*

FRANKLIN E. WHITE, JR.
COLLIN T. MATHIAS
*Attorneys, Commercial Litigation Branch*
*Civil Division, U.S. Department of Justice*
*Signature block continued on next page*
*P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 307-0315*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..........................................................................................i

TABLE OF AUTHORITIES...................................................................................iii

STATEMENT OF RELATED CASES....................................................................1

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION .......................................................................2

STATEMENT OF THE ISSUE...............................................................................2

STATEMENT OF THE CASE.................................................................................2

I.      Statutory Background...................................................................................2

II.     Factual Background......................................................................................3

III.    CIT Proceedings and Commerce's Remand Redetermination......................6

SUMMARY OF ARGUMENT................................................................................9

ARGUMENT ........................................................................................................ 10

I.      Standard of Review.................................................................................... 10

II.     Commerce's Use of the Colliers Report as the Benchmark to Value
        Nur's Land is Supported by Substantial Evidence and in Accordance
        with Law................................................................................................... 11

        A.      Commerce Did Not Disregard the C&W Report, but Instead
                Explained a Reasonable Preference Against Reports Generated
                for the Administrative Review ........................................................13

        B.      Commerce Reasonably Determined that the Colliers Report Was
                Reliable ..........................................................................................16

        C.      Commerce's Selection of the Colliers Report as the Land Value
                Benchmark Is Supported by Substantial Evidence..........................20

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Atlantic Sugar, Ltd. v. United States,*
744 F.2d 1556 (Fed. Cir. 1984) ........................................................................11

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,*
5 F.4th 1367 (Fed. Cir. 2021) ...............................................................12, 18, 19

*Cayuga Indian Nation of New York v. Pataki,*
83 F. Supp. 2d 318 (S.D.N.Y. 2000) .......................................................... 18, 19

*Consol. Edison Co. v. NLRB,*
305 U.S. 197 (1938) ..........................................................................................10

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966) ..........................................................................................10

*CS Wind Malaysia Sdn. Bd. v. United States,*
No. 24-00079, 2025 WL 3496986 (Ct. Int'l Trade Dec. 5, 2025) ..............................23

*Daubert v. Merrel Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ..........................................................................................19

*Downhole Pipe & Equip., L.P. v. United States,*
776 F.3d 1369 (Fed. Cir. 2015) ........................................................................17

*Fujitsu Gen. Ltd. v. United States,*
88 F.3d 1034 (Fed. Cir. 1996) ...................................................................... 9, 10

*Guangdong Wireking Housewares & Hardware Co. v. United States,*
745 F.3d 1194 (Fed. Cir. 2014) ..........................................................................2

*In re Jolley,*
308 F.3d 1317 (Fed. Cir. 2002) ..........................................................................9

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States,*
745 F. Supp. 3d 1305 (Ct. Int'l Trade 2024) ....................................................24

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States,*
  736 F. Supp. 3d 1318 (Ct. Int'l Trade 2024)..............................................................6

*Mosaic Co. v. United States,*
  160 F.4th 1340 (Fed. Cir. 2025) ...................................................................... 3, 10

*Mosaic Company v. United States,*
  589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022)...................................................14

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ........................................................................11

*NMB Singapore Ltd. v. United States,*
  557 F.3d 1316 (Fed. Cir. 2009) ........................................................................12

*Old Gate Partners, LLC v. Paddock Enterprises, LLC,*
  2024 WL 3520168 (D. Conn. May 30, 2024) ........................................... 18, 19

*Ozdemir Boru San. ve Tic. Ltd. Sti. v. United States,*
  273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017).....................................12, 22, 23

*Pokarna Engineered Stone Ltd. v. United States,*
  56 F.4th 1345 (Fed. Cir. 2023)..............................................................9, 12, 20

*Qingdao Sea-Line Trading Co. v. United States,*
  766 F.3d 1378 (Fed. Cir. 2014)..............................................................9, 12, 20

*QVD Food Co. v. United States,*
  658 F.3d 1318 (Fed. Cir. 2011).............................................................18, 22, 25

*Seah Steel Vina Corp. v. United States,*
  950 F.3d 833 (Fed. Cir. 2020) .........................................................................14

*Timken Co. v. United States,*
  788 F. Supp. 1216 (Ct. Int'l Trade 1992) ..............................................passim

*United States v. Guo,*
  23 Cr. 118, 2024 WL 2262706 (S.D.N.Y. May 17, 2024) ...........................19
*Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.,*
  No. 14-CV-00549, 2018 WL 1525709 (D. Conn. March 28, 2018) .................... 18, 19

*Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*,
   782 Fed. App'x 9 (2d. Cir. 2019)......................................................................19

**Statutes**

19 U.S.C. § 1516a...................................................................................... 10, 11

19 U.S.C. § 1671(a) ...................................................................................... 2, 3

19 U.S.C. § 1677(5).........................................................................................11

19 U.S.C. § 1677f............................................................................................12

28 U.S.C. § 1295(a)(5) ......................................................................................2

28 U.S.C. § 1581(c) ...........................................................................................2

**Regulations**

19 C.F.R. § 351.511(a)(2)................................................................................11

**STATEMENT OF RELATED CASES**

Pursuant to Rule 47.5, counsel for defendant-appellee United States states that he is aware of two other cases involving the same or similar countervailing duty issues. These cases may affect, or be affected by, this Court's decision, as they involve the same issue regarding the valuation of the Nur leasehold through three periods of review (2020, 2021, and 2022). The present appeal pertains to the 2020 Review. *See* U.S. Dep't of Commerce, *Steel Concrete Reinforcing Bar from the Republic of Türkiye: Final Results of Redetermination Pursuant to Court Remand* (Jan. 21, 2025) ("Remand Redetermination"). The 2021 and 2022 matters are still pending before the United States Court of International Trade ("CIT"), as Court Nos. 24-0096 and Court No. 25-0225 respectively.

## INTRODUCTION

Pursuant to the Tariff Act, the Department of Commerce assesses countervailing duties intended to offset the benefit a foreign government provides to a business in the form of a countervailable subsidy. One type of countervailable subsidy occurs when the foreign government provides goods or services, such as the use of land, at "less than adequate remuneration." To assess whether land was provided for less than adequate remuneration, parties provide Commerce with information, such as reports, that depict similar transactions to show prevailing market conditions. Commerce refers to these as "benchmarks," and Commerce must select which proposed benchmark on the record is the best available information to measure what the market price is and whether the provision of land was for less than adequate remuneration in relation to prevailing market conditions. If this analysis demonstrates that the foreign government provided the land for less than adequate remuneration, then Commerce may conclude a benefit was conferred. And if the subsidy meets other statutory criteria, Commerce may conclude that a countervailable subsidy exists and impose duties to countervail the benefit conferred.

In the administrative review of the countervailing duty order on concrete reinforcing bar ("rebar") from Turkey, Commerce found that plaintiff-appellant Kaptan Demir Celik Endustrisi Ve Ticaret A.S. (Kaptan) had received a countervailable subsidy from the Turkish government's provision of state-owned land to Kaptan's affiliate. Kaptan submitted a proposed benchmark to measure the

benefit; the U.S. domestic industry submitted a different benchmark.  Considering the two alternatives, Commerce determined that the domestic industry's proposed benchmark was more reliable and accurate.  Kaptan here challenges the CIT's conclusion that Commerce's choice was reasonable, adequately explained, and supported by substantial evidence.  Like the CIT, this Court should also confirm that Commerce's choice is supported by substantial evidence and in accordance with law.

## STATEMENT OF JURISDICTION

The CIT possessed jurisdiction pursuant to 28 U.S.C. § 1581(c).  This Court possesses exclusive jurisdiction to decide appeals from final decisions of the CIT pursuant to 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUE

Whether Commerce's benchmark selection to value the Government of Turkey's provision of land is supported by substantial evidence and in accordance with law.

## STATEMENT OF THE CASE

### I.      Statutory Background

"The Tariff Act of 1930, as amended, permits Commerce to impose two types of duties on imports that injure domestic industries."  *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1196 (Fed. Cir. 2014).  One of these duties, countervailing duties, are imposed on goods that benefit from subsidies provided by a foreign government.  19 U.S.C. § 1671(a).

Commerce may impose a countervailing duty only after determining that a foreign government has provided "a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported." *Id.* § 1671(a)(1). Countervailable subsidies may arise where a foreign government provides goods or services "for less than adequate remuneration" (LTAR) or foregoes "collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income." *Id.* § 1677(5)(D)(ii), (E)(iv). Commerce provides a detailed framework for assessing adequate remuneration in its regulations:

> The Secretary will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. Such a price could include prices stemming from actual transactions between private parties or actual imports. In choosing such transactions or sales, the Secretary will consider product similarity; quantities sold or imported; and other factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(i). "Commerce uses a benchmark price to determine if the goods were sold at LTAR." *Mosaic Co. v. United States*, 160 F.4th 1340, 1343 (Fed. Cir. 2025).

## II.     Factual Background

Commerce first issued a countervailing duty order on rebar from Turkey in 2014. *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Countervailing Duty Order*, 79 Fed. Reg. 65,926 (Dep't Commerce Nov. 6, 2014). During the course of the 2020 review of the countervailing duty order, Commerce issued a questionnaire to Kaptan

asking whether Kaptan received land from Turkey for less than adequate remuneration. *See* Appx150. In its response, Kaptan explained that Nur Gemicilik A.S. ("Nur"), a shipbuilding entity affiliated with Kaptan, received the right to use land rent free from Turkey. *See* Appx150-151. Specifically, Kaptan explained that, in 2014, Nur entered into a 49-year lease with the local government to use state-controlled land rent free if Nur met certain conditions. *See id.* Commerce had previously found this land arrangement to be a countervailable subsidy in previous reviews on this countervailing duty order on Turkish rebar. *See* Appx150.

Subsequently, domestic petitioner Rebar Trade Action Coalition (RTAC) and Kaptan each submitted to Commerce proposed benchmarks to measure the adequacy of remuneration for the rent-free land from Turkey. *See* Appx177, Appx207. RTAC provided Colliers International's *Turkey Real Estate Market Review* (Colliers report), which was publicly available, covered the second half of 2020, which fell within the relevant period of review, and contained lease rates for industrial land in Turkey. *See* Appx183-204. Kaptan provided a "Rent Estimation Study by the real estate firm, Cushman & Wakefield," (C&W Report), *see* Appx207, which was a rent valuation report prepared for Kaptan. *See* Appx212-355.[1]

---

[1] During the original administrative proceedings, Kaptan provided the C&W report as business proprietary information. However, after the CIT's remand, Kaptan provided the C&W report as a public document. *See* Appx116-117.

After its benchmark submission, RTAC submitted comments to support Commerce's use of the Colliers report, including population growth figures, economic data, and other information. *See* Appx619-707. Specifically, RTAC provided population density information which showed that the area in Sürmene, Trabzon, where Nur's lease is located, was most comparable to Çerkezköy, Tekirdağ, the area from which Colliers derived part of the report's data. *Id.*

In the preliminary results, Commerce, evaluating the record, determined that Kaptan received a benefit from Turkey for the rent-free land provided to Nur. *See* Appx61. To measure the amount of the benefit, Commerce calculated a land benchmark based on the Colliers report. *Id.* Specifically, Commerce used the public rental prices from Çerkezköy, Tekirdağ, to determine if Nur's lease was for less than adequate remuneration, because RTAC's population density information showed that that area was most similar to Sürmene, Trabzon. Appx61-62 (citing Appx619-707).

After the preliminary results, Kaptan argued that Commerce should not use the Colliers report as the benchmark. Appx708-733. Kaptan argued that the Colliers report had a disclaimer of liability, which meant that the data was unreliable was distorted by using developed industrial land in the "Greater Island Area;" and that the C&W report was based on more comparable land. Appx716-729.

In the final results, Commerce evaluated the reliability and comparability of both reports and concluded that the Colliers report constituted the best benchmark on the record. Appx74-78. First, Commerce determined that the disclaimer of

liability in the Colliers report did not disqualify the usage of the report outright and that Colliers International is the source of its own data. Appx77. Commerce, weighing the population density information on the record, used the portion of the Colliers report most similar to Nur's rent-free land based on population density. *Id.*

Next, Commerce concluded that the C&W report was not a usable benchmark, in part because it was commissioned by Kaptan, so it thereby carried a "risk of litigation-inspired fabrication or exaggeration." Appx77-78. Commerce explained it has a preference against selecting benchmarks, like the C&W report, which are prepared for the purposes of a proceeding. *Id.* Further, Commerce found that the benchmark methodology of the C&W report appeared to be partially based on prices provided by non-private entities, which it found detracted from that report's reliability. Appx78. Thus, Commerce continued to rely on the Colliers report as the most relevant and quantifiable. *Id.*

## III. CIT Proceedings and Commerce's Remand Redetermination

Kaptan challenged Commerce's benchmark selection in the CIT, which remanded "for Commerce to fully address the arguments presented by Kaptan regarding possible deficiencies in the Colliers report, and, if appropriate, to reconsider its selection of the Colliers report over the C&W report as a benchmark." *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318, 1333 (Ct. Int'l Trade 2024), Appx24.

6

On January 21, 2025, Commerce filed its Remand Redetermination for the 2020 administrative review. Appx110-146. In the Remand Redetermination, Commerce provided further explanation of its responses to Kaptan's arguments and continued to find the Colliers report appropriate to use as the benchmark. *See* Appx122-129; Appx136-145.

Specifically, in the Remand Redetermination, Commerce explained that it further reviewed the Colliers report and found it contained: a general discussion and forecast of Turkey's economic outlook; broad economic indicators for Turkey; narrative descriptions and analysis of the office, industrial, retail, residential, and hotel real estate markets within the greater Istanbul area; rent, vacancy, and related statistics sourced by either Colliers International's own work or other identified entities for the greater Istanbul area in the various types of markets; a title page; and a closing page with a legal disclaimer. Appx124. In particular, Commerce explained that the disclaimer of liability does not disqualify the report from consideration, nor does the fact that the Colliers report is based on numbers compiled by Colliers, but rather, this fact "strengthens the case to use the Colliers report as it is not using secondary sources or compiling sets of data from other sources"). Appx122.

Further, Commerce explained that contemporaneity is a key factor when evaluating benchmarks, as Commerce's preference is to rely on benchmark data sources that are contemporaneous with the bestowal of the land usage rights in question. Appx127 (citing *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*,

7

Court No. 21-00133, Slip Op. 24-128 (Ct. Int'l Tr. Nov. 22, 2024); *Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18,521 (Dep't of Commerce April 4, 2021), and accompanying IDM at Comment 24).  Commerce determined that the Colliers report, sourced from 2020 information, was more contemporary than the C&W report's 2022 prices to Nur's 2014 lease of the rent-free land.  *See* Appx125, Appx128.

Finally, Commerce explained that Kaptan's attempts to detract from the Colliers report were not developed in the record before the agency.  *See* Appx144.  As Commerce noted, Kaptan raised concerns regarding factors such as "distance from Surmene, GDP, value of foreign trade, and the stage of development," but Kaptan provided no record evidence that demonstrates that these differences had a specific effect on land rental values.  *See id.*  As a result, Commerce lacked adequate record information to consider what impact these factors should have on benchmark selection.  Accordingly, Commerce continued to rely on the Colliers report.

After remand, the CIT found that Commerce rectified its initial failure to address Kaptan's arguments about the Colliers report being aberrational.  Appx44-47. The CIT recognized that Kaptan failed to meet its burden to demonstrate the impact of any of the factors it raised.  *See* Appx45.  Acknowledging that Commerce faced two imperfect proposed benchmarks, the CIT held that Commerce reasonably exercised its discretion to decide which one was more accurate.  *See id.*  Accordingly, the CIT

8

sustained Commerce's decision in the Remand Redetermination because Commerce's choice of the Colliers benchmark was supported by substantial evidence. Appx47.

## SUMMARY OF ARGUMENT

This Court should affirm the CIT's judgment because Commerce's final determination reflects a reasonable evaluation of a record limited to two imperfect benchmark alternatives for purposes of its countervailing duty analysis. *See Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345, 1349 (Fed. Cir. 2023) ("'[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence.'" (quoting *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002)); *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014); *see also Timken Co. v. United States*, 788 F. Supp. 1216, 1220 (Ct. Int'l Trade 1992). Due to the complex nature of antidumping and countervailing duty reviews, Commerce is accorded particular deference in its evaluations. *See, e.g.*, *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

Commerce's determination here should be affirmed because it is supported by substantial evidence and in accordance with law. In its Remand Redetermination, Commerce demonstrated that it evaluated all record evidence before selecting the Colliers report instead of the C&W report. After reviewing the creation and the valuation methods used in both reports, Commerce found the Colliers report to be a

9

more suitable benchmark based on substantial evidence indicating the comparability and contemporaneity of both reports to the valuation of the Nur leasehold.

**ARGUMENT**

**I.      Standard of Review**

This Court reviews decisions of the CIT *de novo* and applies the same standard that the CIT applies in its review of Commerce's final determinations. *Mosaic Co.*, 160 F.4th at 1346. Under that standard, this Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.* (quotations omitted); 19 U.S.C. § 1516a(b)(1)(B).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing two different conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g.*, *Fujitsu Gen. Ltd.*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.") (citation omitted). A party disputing Commerce's determination as unsupported by substantial evidence thus "has chosen a course with

10

a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006), and the Court will sustain Commerce's determinations if they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II. Commerce's Use of the Colliers Report as the Benchmark to Value Nur's Land is Supported by Substantial Evidence and in Accordance with Law

When Commerce evaluates the provision of state-owned land to producers of subject merchandise to determine whether the renumeration for the land is adequate pursuant to 19 U.S.C. § 1677(5)(E)(iv), it compares the government price to a benchmark price, representing the market determined price of comparable land. 19 C.F.R. § 351.511(a)(2). In choosing a benchmark, Commerce reviews the complete record provided during the administrative proceeding and makes a determination based on substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B); 1516a(b)(2)(A). Here, the record before Commerce included only two reports: (1) the Colliers report from RTAC and (2) the C&W report from Kaptan. *See* Appx177; Appx207. Neither report provided exact figures to represent industrial lease rates during the same time period and in the same land area as the Nur leasehold. *See id.* As a result, Commerce recognized that it had two imperfect proposed benchmarks to choose between. *See* Appx125.

As the CIT acknowledged below, when the record contains only two imperfect valuation reports, Commerce has discretion to determine which report is generally more accurate, provided its judgment is reasonable. *See* Appx45-46 (citing *Timken Co. v. United States*, 788 F. Supp. 1216, 1220 (Ct. Int'l Trade 1992); *see also Pokarna*, 56 F.4th at 1349; *see also Qingdao*, 766 F.3d at 1386 ("Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute."); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1375 (Fed. Cir. 2021) ("Factual determinations . . . are thus best left to the agency's expertise." (internal quotation marks and citation omitted)). For a selection to be reasonable, Commerce only needs to respond to relevant points made by the parties. *See* 19 U.S.C. § 1677f(i)(3)(A); *see also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009); *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1252 (Ct. Int'l Trade 2017) ("Commerce must consider relevant record evidence in determining the comparability of land parcels it uses in creating a reasonable benchmark that lacks distortive pricing").

In the Remand Redetermination, Commerce reexamined the proposed benchmarks at issue before selecting the Colliers report as the benchmark. Appx122-129; Appx136-145. Commerce's determination to use the Colliers report as a land benchmark was reasonable because Commerce found that that report was a more reliable and comparable benchmark, was not created for the purposes of the administrative proceeding, was derived from primary sources of data, and was more

12

contemporaneous to the rent-free lease providing the land for less than adequate remuneration. *Id.* Therefore, Commerce's benchmark selection is supported by substantial evidence and in accordance with law.

### A. Commerce Did Not Disregard the C&W Report, but Instead Explained a Reasonable Preference Against Reports Generated for the Administrative Review

Kaptan asserts that Commerce had "complete disregard" for the C&W report and asserts that Commerce's preference to avoid reports generated for the review due to the risk of litigation-inspired fabrication was "a very serious accusation." Kaptan Br. at 23-25. Kaptan's argument ignores what Commerce stated and how it evaluated the C&W report.

To be clear, Commerce did not disregard or reject the C&W report and instead fully considered it, weighing it compared to the Colliers report. *See* Appx126-128; Appx140 ("As such, while Commerce did not disqualify or outright 'reject' the C&W report as a benchmark simply because it was prepared for the underlying proceeding, this factor weighs against using the C&W report."). Commerce did not assert that the C&W report was "fabrication," but instead provided insight into Commerce's benchmark analysis practice. Appx125-126. Commerce did not reject the C&W report solely for the preference against documents prepared for the proceeding, but instead Commerce used this evidence as one of the factors it considered when deciding between two imperfect valuation reports. *See* Appx140.

Commerce's practice and preference against reports commissioned and generated for the purposes of the administrative proceeding, such as this review, is reasonable and longstanding because reports commissioned for a proceeding carry some "risk of litigation-inspired fabrication or exaggeration." Appx139 (quoting *Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination,* 72 Fed. Reg. 60,642 (Dep't of Commerce October 25, 2007) (*Coated Free Sheet Paper from Indonesia*), and accompanying IDM at Comment 12)); *see also Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017), and accompanying IDM at 82; *Mosaic Company v. United States*, 589 F. Supp. 3d 1298, 1312-13 (Ct. Int'l Trade 2022) (sustaining Commerce's rejection of a benchmark when it had been prepared for the investigation, among other flaws). This preference is similar to the surrogate value context, where Commerce will normally "use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country." *SeAH Steel Vina Corp. v. United States*, 950 F.3d 833, 841 (Fed. Cir. 2020) (quotation omitted).

Commerce never claimed "that the Cushman & Wakefield Report misrepresented or minimized the land values in Trabzon, for litigation purposes or otherwise." Kaptan Br. at 25. As explained in the Remand Redetermination, although Commerce is concerned that documents prepared for the purposes of a proceeding *may* be tailored to reach specific results, Commerce *does not dismiss* such

14

documents outright on that basis alone.  Appx139.  Rather, Commerce considers additional factors in determining the weight to accord such documents prepared for the purposes of a proceeding.  Such factors may include whether the methodology underlying a particular study or report is clearly articulated, and whether the assertions in reports and studies are supported by citations to data, other third-party studies, or otherwise corroborated by additional record evidence.  Appx139 (citing *Certain Softwood Lumber Products from Canada*, 85 Fed. Reg. 77,163, and accompanying IDM at Comment 2).  That is what Commerce did here: it examined the submissions and the record evidence to reasonably select a benchmark.

Further, Commerce explained why its practice was relevant to the C&W report in this review.  *See* Appx140-141.  Upon examining the report, Commerce found that the report's "Market Research Sources" for "Rent Analysis" were based upon data received from Kaptan.  *See* Appx140 (citing Appx215).  Thus, knowing that Kaptan paid for the creation of the C&W report, provided data for consideration and inclusion in the report, and that the underlying appendices "do not contain the underlying information used" to measure value, it was a reasonable inference for Commerce to be concerned that the C&W report may not be a reliable, accurate, and objective analysis of land rental prices in Turkey.  *See* Appx140-141.  Commerce permissibly draws this reasonable inference from the record before it and properly considers it as just one factor when comparing the two proposed benchmarks.

Kaptan compares Commerce's treatment of the C&W report to the Colliers report, suggesting that Colliers did not "disclose the underlying data used to calculate value." Kaptan Br. at 20. However, this is not an apples-to-apples comparison. Commerce was reasonably concerned about the C&W reports underlying data because record information indicated that Kaptan commissioned the report and that some of the information was based on "data 'received from the client' (*i.e.*, Kaptan Demir)." Appx140 (citing Appx215). On the other hand, there is no question that the Colliers report was not generated for this administrative review, was not commissioned by RTAC, was based on Colliers' own information rather than information provided by RTAC, and is a publicly available source of information. *See* Appx145. Therefore, Commerce's differing treatment of the Colliers report and the C&W report, which was prepared for Kaptan using at least some information provided by Kaptan, is reasonable. Thus, Commerce's application of its practice here was a reasonable factual determination as part of its determination of the best available information on the record. As such, Commerce's hesitancy to use the C&W report is supported by substantial evidence.

**B.    Commerce Reasonably Determined that the Colliers Report Was Reliable**

Kaptan asserts that the Colliers report is not a reliable document and, as a result, Commerce erred by relying on it. *See* Kaptan Br. at 18-23. However, in

16

making this argument, Kaptan merely disagrees with Commerce's factual findings, and these mere disagreements are not a proper basis for remand.

Kaptan asserts that the Colliers report is merely "marketing material" that cannot be used as a valuation. Kaptan Br. at 18-20. In making this argument, Kaptan points to the disclaimer in the Colliers report which states that the report "does not constitute and must not be treated as investment or valuation advice or an offer to buy or sell property." Kaptan Br. at 18-19. However, Commerce addressed this argument. In the Remand Redetermination, Commerce considered the disclaimer and stated that it "does not disqualify the data but rather strengthens the case to use the Colliers report as it is not using secondary sources or compiling sets of data from other sources." Appx141. Kaptan's argument merely "invite[s] this court to reweigh this evidence," which this Court "may not do." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015). Further, Commerce has used Colliers International reports in other determinations, noting that the reports are generated by an "independent third [party]." *See Certain New Pneumatic Off-the-Road Tires from India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with Final Antidumping Determination*, 81 Fed. Reg. 39,903 (Dep't of Commerce June 20, 2016), and accompanying PDM at 32.

Kaptan also asserts that the Colliers report is not reliable because it does not disclose how or where it obtained its land rental data, and further, how it calculated

the land rental values. *See* Kaptan Br. at 20-22. But, as discussed above, when a report "is at least produced by an independent source," in the ordinary course of business, there is no reason to doubt that the report's data, absent evidence to the contrary. *See* Appx128. Commerce recognized that the Colliers report contained "rent, vacancy, and related statistics sourced by either Collier International's own work or other identified entities for the greater Istanbul area in the various types of markets." Appx124 (citing Appx189-204). When a party submits a publicly available report as a proposed benchmark, it would be mere speculation to assume that the data is inaccurate unless there is specific record evidence that calls the accuracy into question. Kaptan, as an interested party, bears "the burden of creating an adequate record" to support its arguments, not Commerce. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011). And this type of factual determination regarding whether submitted information is reliable is "best left to the agency's expertise." *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S.*, 5 F.4th at 1375.

In arguing that the Colliers report was not reliable, Kaptan relies on several district court opinions regarding expert testimony or reports for valuation determinations in litigation. *See* Kaptan Br. at 20-22 (citing *Cayuga Indian Nation of New York v. Pataki*, 83 F. Supp. 2d 318, 324 (S.D.N.Y. 2000); *Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 14-CV-00549, 2018 WL 1525709, at *17 (D. Conn. March 28, 2018); *Old Gate Partners, LLC v. Paddock Enterprises, LLC*, 2024 WL

3520168, at *11 (D. Conn. May 30, 2024); *United States v. Guo*, 23 Cr. 118, 2024 WL 2262706, at *9 (S.D.N.Y. May 17, 2024)).

First, these opinions are non-precedential district court opinions. Second, the procedural posture is so vastly different as to make any potential comparison inapposite. Each of these cited opinions is a district court fact finding under *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to determine whether a proffered expert witness has "sufficient knowledge, skill, training and education to establish themselves as experts." *See Cayuga Indian National of New York*, 83 F. Supp. 2d at 321; *see also Water Pollution Control Auth.*, 2018 WL 1525709 at *6; *Old Gate Parnters*, 2024 WL 3520168 at *6; *Guo*, 2024 WL 2262706, at *8. Commerce is not evaluating proffered expert witnesses when it is choosing between two different proposed benchmark submissions, and instead Commerce must choose the best available information based on the record before it. *See QVD Food*, 658 F.3d at 13224. Even further, Commerce is the fact finder when administrating the antidumping and countervailing duty statutes, and its factual determinations are best left to its expertise. *See Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v.*, 5 F.4th at 1375.[2]

---

[2] To emphasize the point even further, an appeals court affirms a district court's *Daubert* finding "unless it is manifestly erroneous.'" *Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, 782 Fed. App'x 9 (2d. Cir. 2019) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002)).

Thus, Kaptan's attacks on the Colliers report do not demonstrate that it could not be relied upon. However, to be clear, Commerce did not view the Colliers report as the perfect benchmark. Instead, Commerce explained that it "prefer[s] to use a benchmark based upon Kaptan Demir's own private purchases, and would rely on such purchases, or a subset of those purchases, if they were on the record." Appx125-126. That benchmark, however, was not on the record. Instead, Commerce had to make a decision between the two imperfect proposed benchmarks before it: the Colliers report and the C&W report.

**C.      Commerce's Selection of the Colliers Report as the Land Value Benchmark Is Supported by Substantial Evidence**

The Court's "review is limited to the record before Commerce," *Qingdao Sea-Line Trading*, 766 F.3d at 1385. With two imperfect reports available during the benchmarking analysis, Commerce reasonably concluded that the Colliers report offered the best benchmark due to the comparability of various factors highlighted by the interested parties. *See* Appx108; *see also Pokarna*, 56 F.4th at 1349; *Timken Co.*, 788 F. Supp. at 1220.

Kaptan disagrees, asserting that the C&W report is more representative than the Colliers report of the type of land that Nur is receiving as a subsidy. *See* Kaptan Br. at 15-18, 27-28. Kaptan's core argument is that Commerce did not sufficiently account for physical location, specifically that the Colliers report analyzed land values "around 750 miles away" from Nur's rent-free land. *See id.* at 18, 21, 23, 27-28.

Kaptan fails to consider the entirety of the record evidence and otherwise cannot rebut Commerce's benchmark selection here.

Given the information available on the record, Commerce determined that the Colliers report represented the best available benchmark because it was "produced by an independent source," *see* Appx108, and was "more contemporaneous with Nur's 2014 land use rights acquisition." *see* Appx107. Commerce recognized that, on a different administrative record, Commerce might consider other factors such as "physical distance," but that there was "no evidence on the record indicating how these factors impact industrial rent prices." Appx108. The CIT agreed, explaining that Kaptan bore the burden to demonstrate the impact of a factor that it raised to prevent Commerce being trapped "by spaghetti thrown at the wall." Appx45.

Further, Commerce selected land values in Çerkezköy from the Colliers report because Commerce found that the population density was similar to Trabzon (where Nur's land in question is located). This was a reasonable choice from the limited options presented. *See* Appx128-129. Kaptan's response simply claims that "an analysis of the Istanbul market tells you nothing about a market located around 750 miles away, in a less developed area of the country." Kaptan Br. at 18. Instead, Kaptan argues now that Commerce's analysis was akin to "using data from Staten Island to value a lease in Idaho." *Id.* Although colorful imagery, Kaptan continues to fail to point to evidence on the record that shows that Commerce made an error of judgment.

As Commerce explained, Kaptan failed to provide evidence to support its concerns over the level of development of the land and the physical distance between Trabzon and Istanbul. Appx126, Appx144. Commerce needed record evidence supporting Kaptan's claims that these numerous factors should be weighed to have a proportional impact on rental prices and, specifically, a dispositive impact on comparability relative to other factors such as contemporaneity. *Id.* Because Commerce must make its decisions based on the record before it, Kaptan's unsupported arguments regarding these various factors do not find any anchor in the facts of the underlying proceeding, as the CIT recognized below. *See* Appx44; *see also QVD Food Co*, 658 F.3d at 1324.

Kaptan erroneously relies on *Odezmir* to claim that the CIT has previously rejected Commerce's use of land values in suburban Istanbul as benchmark prices for land elsewhere in Turkey. *See* Kaptan Br. at 16-18 (citing *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1249-53 (Ct. Int'l Trade 2017)). In *Odezmir*, the CIT found that Commerce, in selecting a benchmark, should consider whether certain data within the benchmark under consideration are aberrational. *See Odezmir*, 273 F. Supp. 3d at 1250-53. The premise that Commerce should scrutinize benchmark sources to determine whether any data in those sources is aberrational is fundamentally different from the argument put forth by Kaptan that Commerce should disregard *entire benchmarks* if one valuation is derived from a different region and result in higher prices than an alternative benchmark. *Odezmir* provides no

22

support for such an argument. *Id.* In fact, Commerce applied the principle set forth in *Odezmir* when selecting data from the Colliers report to rely upon as a benchmark in valuing Nur's land. *See* Appx128 ("[T]he benchmark province we selected of Tekirdağ, which contains Çerkezköy, also has the most similar GDP to Trabzon (where the land in question is located) of the limited options presented"). If Commerce were to disavow a benchmark solely because it contains higher or lower benchmark prices than the only other alternative on the record, Commerce would not adequately consider the record or "factors affecting comparability" under 19 C.F.R. § 351.511(a)(2)(i).

Kaptan also points to *CS Wind Malaysia Sdn. Bd. v. United States*, No. 24-00079, 2025 WL 3496986 at *4-5 (Ct. Int'l Trade Dec. 5, 2025). *See* Kaptan Br. at 17. However, in *CS Wind*, the CIT remanded for Commerce to respond to an argument for which it "made no such finding" regarding. *See CS Wind*, 2025 WL 3496986 at *4-5. Here, however, Commerce has squarely addressed Kaptan's arguments—they simply are not supported by the record as developed. *See* Appx128.

Finally, Kaptan argues that Commerce's finding that the Colliers report was "more contemporaneous" than the C&W report is unsupported by substantial evidence. *See* Kaptan Br. at 24-25. Not so. Nur's rent-free lease began in 2014. *See* Appx150-151. However, there are no benchmark sources for 2014. Given the choice between the Colliers report covering 2020 and the C&W report covering transactions

23

up to 2022, Commerce reasonably found that the Colliers report was more contemporaneous to the 2014 purchase of land than the C&W report. Appx125.

As Commerce explained here, contemporaneity is a key factor in assessing market conditions and proposed benchmarks. Appx127; *see also Brass Rod from Israel: Final Affirmative Countervailing Duty Determination*, 89 Fed. Reg. 63410 (August 5, 2024), and accompanying IDM at Comment 1. For land benchmarks, Commerce's practice is to rely on benchmark data sources that are contemporaneous with the bestowal of the land usage rights in question. Appx127; *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 745 F. Supp. 3d 1305, 1321 (Ct. Int'l Trade 2024); *Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18,521 (Dep't of Commerce April 4, 2021), and accompanying IDM at Comment 24).

Kaptan argues that the comparable rent data from the 2020 period of review in the Colliers report is not contemporaneous. See Kaptan Br. at 24. This argument is based on speculation rather than evidence in the record. Kaptan claims that the Colliers report includes data from 2021 in its 2020 period because the report was prepared in 2021 and "copyrighted in 2021." *Id.* Kaptan then hypothesizes that "for all we know, the prices contained in the Colliers Review for Çerkezköy could be from

24

a single transaction from a year other than 2020."[3]  *Id.*  Kaptan bears the burden of

demonstrating the relevance of the factors they raise, rather than forcing Commerce

to address "spaghetti thrown at the wall," as the CIT notes.  Appx44 (citing *QVD*

*Food Co.*, 658 F.3d at 1324).  Kaptan failed to meet this burden by providing no

evidence to substantiate their claims that the Colliers report was less

contemporaneous than the C&W report.  Accordingly, the record actually developed

and considered by Commerce supports the conclusion that the Colliers report

contains the most contemporaneous rental data available.

Accordingly, Commerce's decision to rely on the data from the Colliers report

to calculate a benchmark price for land was reasonable, supported by substantial

evidence, and in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the CIT's

judgment.

---

[3]  Not only is this assertion speculative, Kaptan's argument rings hollow because the C&W report includes transactions up to 2022, an even later period.  *See* Appx236.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

PATRICIA M. McCARTHY
  *Director*

FRANKLIN E. WHITE, JR.
  *Assistant Director*

/s/ *Collin T. Mathias*
COLLIN T. MATHIAS
  *Trial Attorney*
  *Commercial Litigation Branch*
  *Civil Division*
  *U.S. Department of Justice*
  *P.O. Box 480, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 307-0315*
  *Collin.t.mathias@usdoj.gov*

May 5, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

/s/ *Collin T. Mathias*
Trial Attorney

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,895 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Collin T. Mathias*
Collin T. Mathias